**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AT&T MOBILITY LLC, NEW CINGULAR WIRELESS PCS, LLC d/b/a AT&T MOBILITY, AT&T MOBILITY NEXT OPERATIONS, LLC, CRICKET WIRELESS LLC, and AT&T CORP.** | ) ) ) ) ) ) ) | **CASE NO. 2:21-CV-00436** <br><br> **JUDGE** |
| Plaintiffs, <br> v. | ) ) ) ) | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| **TAMER SHOUKRY and JOHN DOES 1-20** | ) ) ) ) | **JURY DEMAND ENDORSED HEREON** |
| Defendants. | ) | |

1.     Plaintiffs AT&T Mobility LLC ("AT&T Mobility"), New Cingular Wireless PCS, LLC d/b/a AT&T Mobility ("NCW"), AT&T Mobility Next Operations LLC ("AT&T NEXT"), Cricket Wireless LLC ("Cricket" or "Cricket Wireless"), and AT&T Corp. (collectively "Plaintiffs" or "AT&T"), hereby file this Complaint for Damages and Injunctive Relief against Defendants Tamer Shoukry and John Does 1-20 (collectively "Defendants") and state:

## PARTIES

2.     AT&T Mobility LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard, NE, Atlanta, Georgia 30319.

3.     New Cingular Wireless PCS, LLC d/b/a AT&T Mobility is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard, NE, Atlanta, Georgia 30319.

4. AT&T Mobility Next Operations LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard, NE, Atlanta, Georgia 30319.

5. Cricket Wireless LLC is a Delaware limited liability company with its principal place of business at 1025 Lenox Park Boulevard, NE, Atlanta, Georgia 30319.

6. AT&T Corp is a New York corporation with its principal place of business at One AT&T Way, Bedminster, New Jersey 07921.

7. Defendant Tamer Shoukry ("Shoukry") is an individual who is a resident of Hilliard, Ohio and who conducts business transactions in this District as alleged herein. Upon information and belief, Shoukry resides at 6160 Goldenstrand Court, Hilliard, Ohio, 43026.

8. Upon information and belief, Defendants John Does 1-20 are individuals and co-conspirators who participate in one or more aspects of the Phone Unlocking Conspiracy set forth below, including, but not limited to, manufacturing, distributing, and/or importing circumvention devices and obtaining and supplying unauthorized AT&T ICCID codes (as defined below in paragraph 51) for use with unlawful circumvention devices.

## JURISDICTION AND VENUE

9. Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because Plaintiffs' claims for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*. and the Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.* arise under federal law. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy. This Court also has jurisdiction because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest.

10.    Defendant Shoukry is subject to the personal jurisdiction of this Court because he is a resident of Franklin County, Ohio. All Defendants are also subject to the personal jurisdiction of this Court because they have conducted, engaged in, and carried out business ventures within the State of Ohio including unlocking ineligible AT&T Locked iPhone devices (defined below in paragraph 17) without authorization, have committed tortious acts within the State of Ohio, and have engaged in substantial and not isolated activity within the State of Ohio.

11.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants either reside in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

12.    Defendants are engaged in the production, sale and distribution of an electronic device designed to allow users of their device to defraud Plaintiffs by circumventing a locking mechanism on Plaintiffs' cellular telephones. Defendants produce, sell and distribute the device with the purpose of knowingly facilitating the fraud against Plaintiffs.

13.    AT&T (including its subsidiary Cricket) is one of the largest providers of wireless service in the United States. AT&T currently serves millions of customers nationwide and has developed a highly regarded business reputation in the public and amongst its customers for deploying innovative technologies and services for its customers. AT&T sells new wireless phones and other mobile devices to both consumers and business customers. AT&T wireless phones shall be collectively referred to as "AT&T Phones" or "Phones."

14.    To maintain its standing as a leader in a competitive industry, AT&T expends substantial resources to provide its vast and reliable nationwide wireless network, and to help ensure that its customers are able to acquire high-quality phones at affordable prices for use on the

AT&T Authorized Network, defined below in paragraph 19.  Depending upon the kind of service purchased by the customer, AT&T installment contracts, subsidies, discounts and rebates allow AT&T to offer affordable, high-quality phones to its customers.  In turn, to be able to offer such subsidies, discounts, rebates and installment contracts, AT&T depends on customers activating and using their phones with rate plans to be used on the AT&T Authorized Network during the specified minimum time period after activation (the "AT&T Service Period") and, as applicable, fulfilling contractual commitments.

15.     The Phones at issue in this action are various models of the iPhone mobile phone made by Apple Inc. ("Apple").  Apple and other retailers sell iPhone devices that are either "locked" to a specific wireless carrier such as AT&T, or "unlocked."  Unlocked iPhone devices are sold by Apple and other retailers at full retail price, which can be well over $1,000 for some models.

16.     Apple iPhone devices are extremely popular mobile phones.  To make iPhone devices more accessible to consumers who may not be able to afford the full retail prices, AT&T sells iPhone devices to customers that are locked to the AT&T Authorized Network through installment plans, discounts, rebates and subsidies that either permit low monthly installment payments over several months at 0% interest or reduce the purchase price of the Phone.  For instance, AT&T's installment plan is essentially an interest-free loan to a subscriber for the AT&T Locked iPhone devices, and the customer pays off the loan by fulfilling the payment obligations of their installment plan.

17.     AT&T sells iPhones that come with SIM cards and electronic SIMs ("eSIMs") connected to the AT&T Authorized Network.  When AT&T sells a phone under an installment

4

contract or subsidy (collectively "AT&T Locked iPhone devices"), that phone is locked to the AT&T Authorized Network during the AT&T Service Period.

18.     AT&T's business model in offering its customers AT&T Locked iPhone devices either at substantially reduced prices or through installment agreements is viable only if the AT&T Locked iPhone devices are activated and used as intended with rate plans on the AT&T Authorized Network during the AT&T Service Period and customers satisfy their installment agreement commitments or other obligations.  AT&T is able to offer installment plans, discounts, rebates and subsidies for AT&T Locked iPhones based on expected wireless service revenue from rate plans and, for AT&T Locked iPhones sold on an installment agreement, payoff of the Phone based on the terms of the installment agreements.  If the Phones remain locked to the AT&T Authorized Network until a minimum service period is satisfied or, if applicable, the installment balance is paid in full, AT&T can enforce payment requirements by suspending or disconnecting service to the Phone for failure to pay installment payments (or other charges due).

19.     AT&T Locked iPhone devices generally may only access the AT&T Authorized Network.[1]  The AT&T Authorized Network includes AT&T's owned and operated network in the United States, networks of other wireless service providers within the United States with which AT&T has roaming agreements (off-net domestic roaming), and the networks of international wireless service providers outside the United States with which AT&T has roaming agreements (off-net international roaming) (collectively, the "Coverage Area").  If an AT&T Locked iPhone is unlocked and used on an unauthorized non-AT&T network during the AT&T Service Period or

---

[1] AT&T Locked iPhone devices may access networks other than the AT&T Authorized Network in certain limited circumstances, such as dialing 911 during an emergency.

prior to applicable commitments being satisfied, AT&T loses revenue from lost wireless service and, as applicable, lost installment payments and subsidies.

20.     Locking Phones to a service provider's network for a limited period is common industry practice, typically used to provide additional protections for payments, including but not limited to payment of remaining unpaid balances on phones purchased under installment contracts; without such measures, for example, perpetrators of a fraudulent scheme could simply purchase one or more Phones, which can be worth over $1,000 apiece, under installment agreements, then take the Phones to a competing network, sign up for monthly service with the new provider, and stop making payments to AT&T even though they still owe AT&T all or most of the money AT&T loaned at zero percent interest under the installment agreement.  As set forth below in Part VI, the widespread occurrence of unauthorized unlocking has caused severe harm to AT&T.

**I.      AT&T's Wireless Phone Business**

21.     AT&T offers wireless service to its customers on postpaid rate plans through AT&T Mobility.  AT&T also offers wireless service to its customers on prepaid plans through AT&T PREPAID (an AT&T Mobility brand) and Cricket.  Customers on prepaid plans pay in advance for a specified amount of voice, text, and data services for a specified term, typically a monthly basis, whereas customers on postpaid plans are typically billed a recurring monthly charge for voice, text, and data services and are able to pay certain usage one billing cycle in arrears (i.e., on credit).  AT&T offers wireless service to individual consumers and business customers.

22.     As set forth in detail in the following sections, all AT&T and Cricket customers on postpaid and prepaid plans must agree to contractual terms of service when they purchase an AT&T Phone and/or open an account with AT&T or Cricket.

    a.    **AT&T Mobility's Postpaid Wireless Business**

23.    AT&T Mobility offers wireless service and sells Phones to both consumers and large and small businesses ("Business Customers"). Each segment of customers agrees to specific contractual terms of service prohibiting unauthorized unlocking of AT&T Locked iPhone devices during a specified period of time.

24.    AT&T Mobility sells Phones to consumers through various retail channels, including directly from the AT&T website, from retail stores owned by AT&T Mobility, through authorized AT&T Mobility dealers ("Authorized Dealers"), through call centers, and through AT&T Mobility approved national retail chains such as Best Buy, Walmart, or Target ("National Retailers").

25.    AT&T Mobility sells AT&T Locked iPhone devices to postpaid customers through installment plans, thereby enabling its customers to purchase expensive iPhone devices over a period of time, with no interest, by paying low monthly installments along with the monthly charges for the consumer's AT&T Mobility wireless service rather than paying full price at the time of purchase. AT&T also periodically offers discounts, rebates, and other incentive promotion programs to its customers, including discounts for customers who are transferring an existing phone number or trading in a phone, adding additional lines for friends and family on the same account, or even existing subscribers upgrading their phones.

26.    Consumer AT&T Mobility customers must review and agree to AT&T's Wireless Customer Agreement ("WCA") when they open wireless accounts with AT&T. As such, customers purchasing phones, including AT&T Locked iPhone devices, from AT&T for use with AT&T's service must have reviewed and agreed to AT&T's WCA before they may use the iPhone devices with AT&T mobile service. The WCA is a valid and binding contract between AT&T and each of its consumer customers. As set forth below, AT&T provides multiple forms of notice to

customers that by purchasing an AT&T Phone, they are agreeing to comply with the conditions set forth in the WCA.  AT&T also provides the full text of the WCA on its website, which is readily available and kept up to date.  A copy of the WCA is attached as Exhibit 1.

27.     Likewise, Business Customers must review and agree to the AT&T Mobile Business Agreement, the AT&T Corporate Digital Advantage Agreement, or another similar wireless service agreements (each, a "Business Agreement") when they open wireless accounts with AT&T.  As such, Business Customers purchasing phones, including AT&T Locked iPhone devices, from AT&T for use with AT&T's service must have agreed to a Business Agreement terms before they may use the iPhone devices with AT&T mobile service.  Each Business Agreement is a valid and binding contract between AT&T and the Business Customer.  As set forth below, AT&T provides multiple forms of notice to Business Customers that by purchasing an AT&T Phone, they are agreeing to comply with the conditions set forth in the Business Agreement.  A sample of the relevant terms from a Business Agreement (excerpted from the AT&T Mobile Business Agreement used by most small business customers) is attached as Exhibit 2.

28.     The WCA for consumer customers expressly provides, in pertinent part:

> You agree that you won't make any modifications to your Equipment or its programming to enable the Equipment to operate on any other system. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Equipment on other systems.

29.     The WCA also reserves AT&T's right to cancel services for a customer who modifies a device from manufacturing specifications or uses the device in a way that is "harmful to, interferes with, or negatively affects [AT&T's] network," or "for an unlawful or fraudulent purpose."

30. The Business Agreements also contain substantially similar contractual clauses as the abovementioned provisions of the WCA.

31. In addition to the WCA, AT&T Mobility also requires both business and consumer postpaid customers purchasing phones on AT&T installment plans to review and agree to a Credit Sale Contract ("CSC"), which is a valid and binding contract between AT&T Mobility's subsidiaries NCW and AT&T NEXT and its customers. All consumer and business postpaid customers purchasing phones on AT&T installment plans are AT&T Mobility subscribers who have wireless service with AT&T pursuant to the WCA or a Business Agreement. Accordingly, all postpaid consumers with AT&T Locked iPhone devices must affirmatively agree to the WCA or a Business Agreement when they agree to purchase AT&T Mobility service. Customers purchasing phones on installment plans are provided their CSC terms and conditions, including notices and disclosures, at point of sale and thereafter as requested by the customer or as provided through customer-elected electronic access. AT&T also provides a copy of the full text of a CSC on its website, which is readily available and kept up to date. A copy of a CSC is attached as Exhibit 3.

32. The CSC expressly provides, in pertinent part:

> This Agreement requires that You maintain eligible voice and/or data wireless services ("Service(s)") on Your Device. Service(s) are subject to Your Wireless Customer Agreement, Your AT&T business or government agreement, or an agreement with another wireless service provider authorized by us in our sole discretion (in any case the "Service Agreement").

33. Except in limited circumstances described above in footnote 1, AT&T Mobility Locked iPhone devices must be used on the AT&T Authorized Network until they are unlocked. AT&T Mobility Locked iPhone devices sold subject to a CSC must wait at least 60 days after

purchase[2] and, if applicable, satisfy the CSC contractual commitments, which can include making all required monthly payments, paying off the remaining balance, or otherwise fulfilling the contract terms, before they can be unlocked.  Once a customer has satisfied an applicable AT&T Service Period and complied with other contractual obligations, AT&T Mobility will unlock the customer's Phone upon request for free.  AT&T Mobility customers can request that eligible phones be unlocked for free by calling AT&T or by placing a request through an online portal.

### b. **AT&T PREPAID and Cricket's Prepaid Wireless Business**

34.     AT&T Mobility sells AT&T PREPAID Phones and service through various retail channels.  AT&T sells AT&T PREPAID Phones directly from the AT&T website, from retail stores owned by AT&T Mobility, through authorized AT&T Mobility dealers ("Authorized Dealers"), and National Retailers.

35.     Cricket sells prepaid Phones through various retail channels.  Cricket sells Phones directly from the Cricket website, from authorized Cricket dealers ("Cricket Dealers"), and through National Retailers.

36.     AT&T and Cricket both sell iPhone devices to prepaid customers that are locked to the AT&T Authorized Network at discounted prices.  AT&T PREPAID and Cricket subsidize a portion of the cost of each AT&T Locked iPhone device.  AT&T PREPAID and Cricket are able to subsidize the cost of AT&T Locked iPhones based on expected wireless service revenue.

37.     AT&T PREPAID requires customers purchasing Phones to review and agree to the AT&T PREPAID Plan Terms and Terms of Service ("AT&T PREPAID Terms") when an account is opened.  Therefore, before an AT&T PREPAID customer may use a phone on the AT&T

---

[2] AT&T Mobility Locked iPhone devices sold to small business customers must wait at least 30 days after purchase and 60 days after activating service, whereas devices sold to enterprise customers must wait at least 60 days after purchase.

Authorized Network, including any prepaid AT&T Locked iPhone devices, the customer must accept the AT&T PREPAID Terms.  The AT&T PREPAID Terms are valid and binding contracts between AT&T PREPAID and each of its customers.  As set forth below, AT&T PREPAID provides multiple forms of notice to customers that by purchasing an AT&T Phone, they are agreeing to comply with the conditions set forth in the AT&T PREPAID Terms.  AT&T also maintains the full text of the AT&T PREPAID Terms, which are readily available and kept up to date, on its website.

38.    Cricket requires customers purchasing Phones to review and agree to the Cricket Wireless Terms and Conditions of Service ("Cricket Terms") when an account is opened. Therefore, before a Cricket customer may use a phone on the AT&T Authorized Network, including any prepaid AT&T Locked iPhone devices, the customer must accept the Cricket Terms. The Cricket Terms are valid and binding contracts between Cricket and each of its customers.  As set forth below, Cricket provides multiple forms of notice to customers.  By purchasing an AT&T Phone, they are agreeing to comply with the conditions set forth in the Cricket Terms.  Cricket also maintains the full text of the Cricket Terms, which are readily available and kept up to date, on its website.

39.    Except in limited circumstances not applicable here and discussed in footnote 1, Cricket and AT&T PREPAID customers' AT&T Locked iPhone devices can be used only on the AT&T Authorized Network until they are unlocked.  AT&T Locked iPhone devices sold on a prepaid plan must be used with the AT&T Authorized Network for at least six months before they are eligible to be unlocked.  Once a Cricket or AT&T PREPAID customer has satisfied the applicable service period, Cricket or AT&T PREPAID will unlock the customer's phone upon request for free so long as it has not been reported lost or stolen.  Depending upon the type of

device the customer has, Cricket and AT&T PREPAID customers can request that eligible phones be unlocked for free by calling Cricket or AT&T PREPAID or by placing a request through their respective online portals.

40.    AT&T prepaid phone subsidies and discounts allow Cricket and AT&T PREPAID to offer affordable, high-quality phones to their customers.  In turn, to be able to offer such subsidies and support its wireless network, Cricket and AT&T PREPAID depend on legitimate customers activating and using their phones on the AT&T Authorized Network during the AT&T Service Period.  If an AT&T Locked iPhone is unlocked and used on an unauthorized non-AT&T network during the required service period, Cricket or AT&T PREPAID loses revenue from lost wireless service.  As set forth below in Part VI, the widespread occurrence of unauthorized unlocking has caused severe harm to AT&T.

i.    **AT&T PREPAID's Terms and Conditions of Service**

41.    AT&T Locked iPhone devices sold to prepaid customers by AT&T PREPAID are sold subject to the AT&T PREPAID Plan Terms and Terms of Service, which conspicuously restrict and limit the sale and use of the Phones.  A copy of the AT&T PREPAID Terms is attached as Exhibit 4.  The AT&T PREPAID Terms are referenced in a printed warning placed on the outside of the packaging of every AT&T PREPAID iPhone sold directly by AT&T, at National Retailers, or at Authorized Dealers, and are also available to the public on AT&T's website.  The AT&T PREPAID Terms constitute a valid binding contract.

42.    The packaging in which new AT&T PREPAID iPhones are sold at National Retailers contains the following language that is printed on the outside of the package:

> This phone must be activated on AT&T PREPAID$^{SM}$ service and is **not for resale**.
>
> By purchasing or activating this phone, you are agreeing to the AT&T PREPAID Plan Terms & Terms of Service (available at

att.com/prepaidterms). If you do not agree, return it unopened to the place of purchase for a full refund. For important information and details on AT&T's network management practices see att.com/broadbandinfo.

(emphasis in original).

43.     Similarly, for customers purchasing AT&T PREPAID phones directly from AT&T or at AT&T Authorized Dealers, after payment each customer is provided with a printed Customer Service Summary document containing a further reminder of the Terms and Conditions. A copy of a representative Customer Service Summary is attached as Exhibit 5.

44.     The AT&T PREPAID Terms provide, in pertinent part, as follows:

> Devices designed for use only on AT&T's network ("Equipment") may not function on other wireless networks. Equipment is sold exclusively for use with AT&T PREPAID service and may not be resold. By purchasing such Equipment you agree to activate and use it on AT&T PREPAID service. You also agree that you will not make, nor will you assist others to make, any modifications to the Equipment or programming to enable the Equipment to operate on any other system. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Equipment on other systems. You understand and acknowledge that the Equipment is sold solely for use with AT&T's prepaid service and that AT&T will be significantly damaged if you use or assist others to use the Equipment for any other purpose. You agree not to take any action to circumvent limits on the quantity of Equipment that may be purchased. You will be liable to AT&T for any damages resulting from the conduct prohibited in this section.

**ii.     Cricket Wireless's Terms and Conditions of Service**

45.     AT&T Locked iPhone devices sold to prepaid customers by Cricket are sold subject to the Cricket Wireless Terms and Conditions of Service, which conspicuously restrict and limit the sale and use of the Phones. A copy of the Cricket Terms is attached as Exhibit 6. Cricket customers accept the Cricket Terms when activating service online, at authorized Cricket dealers, or through National Retailers, and those terms are also available to the public on the Cricket website.

46.     The Cricket Terms expressly provide, in pertinent part:

> You [] agree that you will not make, nor will you assist others to make, any modifications to any Device you purchase from Cricket or programming to enable it to operate on any other system or network except in accordance with our Device Unlocking Policy found at www.cricketwireless.com/legal-info/device-unlock-policy.html. We reserve the right to relock any Device to the Cricket network where we determine the Device has been unlocked in violation of our Device Unlocking Policy. You understand and acknowledge that Devices you purchase from Cricket are sold solely for use with our network and that we will be significantly damaged if you use or assist others to use our Devices for any other purpose. You also agree not to take any action to circumvent limits on the quantity of Devices that may be purchased from Cricket. You will be liable to Cricket for any damages resulting from conduct prohibited in this section.
>
> …
>
> When you purchase, activate or use our Services or any Devices you agree that you will not misuse or abuse our Services or Devices by doing, among other things, any of the following: (a) purchasing a Device without intending to activate or use it on our network; (b) reselling or rebilling our Services, or reselling Devices purchased from Cricket; (c) modifying your Device from its manufacturer's specifications; … [or] (e) using our Services or any Devices for any fraudulent or unlawful purpose[.]

## II.     Proprietary Software on AT&T iPhone devices

47.     AT&T Locked iPhone devices are sold with preinstalled proprietary and copyrighted software belonging to Apple, including the iOS operating system, the Safari web browser, and the iMovie video editing app ("Proprietary Software").

48.     On an unlocked iPhone, the Proprietary Software is always accessible by the user. On an AT&T Locked iPhone device, however, AT&T maintains the exclusive right to control access to the Proprietary Software installed on AT&T Locked iPhone devices through the SIM Lock, which restricts access to substantially all functionality on AT&T Locked iPhone devices when not connected to the AT&T Authorized Network.

14

49.     AT&T's right to control access to the Proprietary Software is an important part of the SIM Locking process and its business model discussed above. In particular, by taking these security measures, AT&T ensures that customers use the AT&T Authorized Network during the required AT&T Service Period and, as applicable, fulfill CSC contractual commitments.

## III.     SIM Lock on AT&T Locked iPhone devices

50.     AT&T uses the SIM Lock on each AT&T Locked iPhone device to ensure that these devices are only used with the AT&T Authorized Network. This SIM Lock is intended to prevent the phones and the software thereon from being accessed or used outside the AT&T Authorized Network unless AT&T receives a valid unlock request from a legitimate AT&T customer and unlocks the phone or provides the customer with an unlock code.

51.     When AT&T sells mobile phones, including Apple iPhone devices, AT&T generally relies on SIM cards inserted into a phone to access cellular networks. Each SIM card also contains a unique 20-digit identifier known as an Integrated Circuit Card Identifier ("ICCID"). ICCID numbers are electronically stored within each SIM card as well as printed on the exterior of the SIM card. When a SIM card is placed inside of a mobile phone, the SIM card engages with the phone, and the two devices communicate with each other. Through this connection, the phone reads information on the SIM card, including the ICCID number. Under ordinary circumstances, each ICCID is unique to a specific SIM card, and is transmitted directly to the phone when it reads information from the SIM card. Likewise, under ordinary circumstances, it is impossible for the user of a cellular phone to change the ICCID transmitted from the SIM card to the phone, or to use a given ICCID simultaneously with more than one phone, because a given SIM card may only be inserted into one mobile phone at a time.

52.     Industry specifications allow for a limited set of applications and commands commonly referred to as the SIM ToolKit ("STK") applications and commands to be implemented

on SIM cards. STK applications and commands can interface with and alter a device's menu structure. Because unauthorized STK applications and commands may enable tampering, fraud, attacks on the wireless network, or the theft of subscriber and carrier data, wireless carriers including AT&T do not enable end users to run STK applications and commands on unmodified phones, and expressly forbid users from running or using STK applications on their phones to enable the phones to operate on other networks or systems as referenced above. For example, in addition to the prohibitions discussed above, the WCA, Business Agreements, AT&T PREPAID Terms, and the Cricket Terms each additionally forbid the use of AT&T's wireless data services "in any manner that defeats, obstructs or penetrates, or attempts to defeat, obstruct or penetrate the security measures of [AT&T's/Cricket's] wireless network or systems, or another entity's network or systems; that accesses, or attempts to access without authority, the accounts of others; or that adversely affects the ability of other people or systems to use either [AT&T's/Cricket's] wireless services or other parties' Internet-based resources."

53.     As set forth above, each AT&T Locked iPhone device is programmed with the SIM Lock, preventing the use of the Phone on a network other than the AT&T Authorized Network. As set forth in the WCA, AT&T informs users of postpaid AT&T Locked iPhone devices with postpaid service that they are expected to fulfill their contractual obligations before AT&T will unlock their Phones. Specifically, the WCA provides that "[i]f you wish to use this Device with the service of another wireless telephone carrier, AT&T will unlock your device if you meet certain qualifications including, but not limited to the following: (a) you have paid for your Device in full; (b) your device was purchased on an installment plan and the service on your wireless number has been active for at least sixty days and is in good standing (i.e. it has no past due amount owed AT&T); (c) you have fulfilled your Service Commitment by expiration of any contractual term;

(d) your Device has not been reported lost or stolen; and (e) AT&T has the Unlock Code (where applicable) or can reasonably obtain it from the manufacturer." The Business Agreements incorporate by reference contractual clauses that are substantially the same as the abovementioned provisions of the WCA. Similarly, the AT&T page "Get Info About Device Unlock Eligibility" found at att.com/deviceunlock provides to qualify for unlocking, the AT&T Locked iPhone must have "a paid-off installment plan," must not "have a past-due account balance" or have "been reported as lost, stolen, or involved with fraud," and for prepaid AT&T Locked iPhone devices, must have "had paid service for at least 6 months." A copy of the "Get Info About Device Unlock Eligibility" page is attached as Exhibit 7.

54. As set forth in the Cricket Terms, AT&T informs users of Cricket branded Locked iPhone devices that they are expected to fulfill their contractual obligations before AT&T will unlock their Phones. Specifically, the Cricket Terms provide that "[i]f you bought a Device from Cricket, it is programmed with a SIM lock which will prevent it from operating with other compatible wireless telephone carriers' services. For information on how to unlock the Device, please see our Device Unlocking Policy at www.cricketwireless.com/legal-info/device-unlock-policy.html." As set forth in Cricket's Wireless Device Unlock Policy ("Cricket Unlock Policy"), AT&T will only provide an unlock code to a customer if the Cricket Wireless Phone: 1) has not been reported lost or stolen, 2) is not associated with a fraudulent account, 3) is designed for use and is locked to the Cricket network, and 4) has been active on the Cricket Wireless network for at least six months of paid service. A copy of the Cricket Unlock Policy is attached as Exhibit 8.

55. When an AT&T Locked iPhone device is powered on, the SIM Lock reads data from the inserted SIM card, including the ICCID. If the ICCID from the inserted SIM card is associated with a valid AT&T SIM card, the SIM Lock allows the user to fully operate the iPhone

so long as the valid SIM card is installed. If the ICCID number is not associated with a valid AT&T SIM card, the iPhone displays a message stating that the SIM is not supported, and does not allow the user to access the iPhone or any of the installed applications on the Locked iPhone device.

56. The "Unlock a Phone or Device" page on AT&T's website allows any person – including Defendants – to check at any time whether an AT&T Phone is eligible for unlocking by providing the International Mobile Equipment Identity ("IMEI") number for the Phone, and/or the AT&T mobile number associated with the Phone. AT&T then sends an email or text message to the user confirming the request, and then sends another email or text message showing the Phone's eligibility for unlocking. AT&T does not charge for this service.

57. Similarly, the "Device Unlock Codes" page on the Cricket website sets forth instructions for any person – including Defendants – to check at any time whether an AT&T Phone is eligible for unlocking. The page directs active Cricket customers to sign into My Account and visit the Account Settings page, where they can request an unlocking code. Upon receiving an unlocking code request for an eligible phone, Cricket then causes the unlock code to be displayed on the screen for users of Android phones or sends the unlocking code by text message to users of Apple iPhone devices. The page also instructs all persons who are not Cricket customers to call Cricket Customer Support to check unlocking eligibility. Cricket does not charge for this service.

## IV. **Defendants' Misconduct**

58. Defendants and their co-conspirators are perpetrators of an unlawful conspiracy (the "Conspiracy" or "Phone Unlocking Conspiracy") to profit from the illegal unlocking of AT&T Locked iPhone devices, thereby allowing purchasers of AT&T Locked iPhone devices to defraud AT&T, for example by abandoning their installment plans without fulfilling their payment obligations. Defendants profit directly by the unauthorized mass distribution of codes in

conjunction with the provision of unlocking devices to their co-conspirators for a fee. In so doing, Defendants and their co-conspirators misappropriate the substantial financial investment that AT&T makes in these iPhone devices, harm AT&T's ability to provide iPhone devices to postpaid customers with installment plans, harm AT&T's ability to provide iPhone devices to prepaid customers with subsidies, and convert AT&T's investment for their own profit and to the detriment of AT&T and its legitimate customers. Defendants' actions also cause considerable downstream impact by increasing the costs of AT&T's overhead.

59.     AT&T has discovered that AT&T Locked iPhone devices are being unlocked without authorization, causing AT&T to lose paying customers and enabling certain customers to purchase AT&T Locked iPhone devices on installment contracts and switch to other networks without fulfilling the terms of these installment agreements. Defendants and their co-conspirators are engaged in unauthorized unlocking of AT&T Locked iPhone devices and profiting from their activities at AT&T's expense. In particular, Defendants sell a small hardware circumvention device known as a "Genie SIM," to customers for a fee. Upon information and belief, some or all of Defendant's customers are AT&T customers or have purchased AT&T Locked iPhone devices.

60.     Unlocked AT&T iPhone devices can be used with other carriers' SIM cards in the United States or throughout the world. Once an AT&T Locked iPhone device is unlocked for use with another carrier, AT&T is no longer able to prevent the user of that device from utilizing SIM cards and networks of other carriers or disconnect service for nonpayment of the balances on the Phone's installment contract, and its ability to recoup its investment on that AT&T iPhone is significantly impaired.

61.     The process of unauthorized unlocking of AT&T Locked iPhone devices involves inserting the Genie SIM device into the SIM card tray between the metal contacts of a non-AT&T

SIM card and the iPhone's internal metal contacts. This placement allows the Genie SIM to monitor and intercept messages between the SIM card and the iPhone, circumvent the SIM Lock technological protection measure, and directly access the SIM interface, base band and application server in the iPhone. The Genie SIM then allows the user of the Genie SIM device to bypass the SIM Lock technology by manually inputting an unauthorized AT&T ICCID, copied from an AT&T SIM card that is not inserted into the Locked iPhone device and provided by Defendants. When the AT&T Locked iPhone attempts to read the ICCID of the inserted invalid SIM card, the Genie SIM device intercepts the communication. By transmitting STK commands to the AT&T Locked iPhone, the Genie SIM device forces the AT&T Locked iPhone to allow the user to enter an unauthorized AT&T ICCID, and then resets the iPhone. Upon resetting, the SIM Lock is disabled and the Phone is unlocked. The AT&T iPhone remains unlocked so long as the Genie SIM remains inserted, as it continues to bypass the SIM Lock. In essence, the Genie SIM device enables its user to mask the non-AT&T ICCID number on a SIM card that would otherwise cause the SIM Lock to render the iPhone inoperative with an unauthorized AT&T ICCID number that obtains an unlock response.

62.     Defendants also acquire and distribute AT&T ICCID numbers that purport to contain a legitimate AT&T-specific ICCID ("unauthorized AT&T ICCIDs") to purchasers of the Genie SIM device through the use of a service called "ICCID Miner." Defendants make unauthorized AT&T ICCIDs available to their customers who pay a monthly subscription fee for access to the ICCID Miner. Defendants' customers then manually input these unauthorized AT&T ICCIDs using the Genie SIM device, after which the AT&T Locked iPhone behaves as though the inserted SIM card has the unauthorized AT&T ICCID number. Because specific unauthorized AT&T ICCIDs can become invalid over time, Defendants repeatedly update the collection of

unauthorized AT&T ICCIDs available on the ICCID Miner. In this way, if AT&T determines that an ICCID is being used to unlock phones without authorization and invalidates it, Defendants can publish another number and their customers can manually enter the new number instead, thereby continuously circumventing the SIM Lock. Upon information and belief, Defendants obtain unauthorized AT&T ICCIDs from AT&T or companies that have a relationship to AT&T by making fraudulent representations to AT&T or its affiliated companies. Defendants profit from their sales of the Genie SIM devices. Defendants also profit from selling access to unauthorized AT&T ICCIDs through the ICCID Miner.

63. An agreement and conspiracy existed and continues to exist between and among each of the Defendants and their co-conspirators to unlawfully engage in acquisition and transmission of unauthorized AT&T ICCIDs, and to manufacture, import, and/or sell Genie SIM devices (the "Phone Unlocking Conspiracy"). While the full extent of each Defendant's activities in the Phone Unlocking Conspiracy is not yet known, Defendants have at least conspired to sell or provide Genie SIM devices and unauthorized AT&T ICCIDs to engage in unauthorized unlocking of AT&T Locked iPhone devices.

64. The sole purpose for Defendants' Phone Unlocking Conspiracy is for profiting at AT&T's expense and misappropriating AT&T's financial investment in the Phones.

65. Defendants knowingly agreed to engage and did engage in one or more overt acts in furtherance of the conspiracy as set forth with more particularity in this Complaint.

66. AT&T has been proximately damaged by the conspiracy and by Defendants' actions in furtherance of the conspiracy.

67. Defendant Shoukry maintained a Facebook profile with the user handle "Tamermrwirelessohio." On January 28, 2020, AT&T's investigators contacted Mr. Shoukry via

21

Facebook Messenger, inquiring about purchasing Genie SIM devices. Mr. Shoukry sold ten (10) Genie SIM devices to the investigators for $15 each. During this exchange, Mr. Shoukry explained that the Genie SIM devices would unlock iPhone models from the iPhone 7 through the iPhone 11, and confirmed that it would work with new AT&T iPhone devices. Mr. Shoukry also provided the investigators with instructions and instructional videos on using the Genie SIM devices, and also transmitted the "current" ICCID to the investigators by text message. Mr. Shoukry also linked the investigators to the ICCID Miner service and assured them that they would be able to obtain the most recent unauthorized AT&T ICCID from the ICCID Miner. Mr. Shoukry represented to the investigators that he was the owner of "Genie SIM," and provided a link to the website "unlockgeniesim.com."

68. On February 3, 2020, the investigators received an additional ten (10) Genie SIM devices via a FedEx package, which identified Mr. Shoukry as the sender.

69. On February 21, 2020, the investigators communicated with Mr. Shoukry via Facebook Messenger. Mr. Shoukry expressed his full understanding that the Genie SIM devices would be utilized to unlock ineligible locked devices under contract by assuring the investigators that their newly unlocked phones could not be relocked by AT&T even if the phones were under contract or not paid off. Mr. Shoukry also directed the investigators to join the "geniesimhustlers" Facebook group, and represented that this group could provide "all of your tech support" for the Genie SIM devices.

## V. Substantial Harm Caused by Defendants' Misconduct

70. Defendants' actions significantly harm AT&T in numerous ways, including, inter alia: 1) AT&T is defrauded of the value of Phones purchased under installment contracts which are then removed from the network without the customers fulfilling the CSC contractual commitments; 2) AT&T is deprived of the opportunity to earn profits by providing wireless service

to legitimate AT&T customers during the AT&T Service Period and, as applicable, installment plan term; and 3) Defendants' actions seriously and irreparably interfere with AT&T's relationships with its dealers, National Retailers, and customers. All of these factors undermine AT&T's competitive edge in the cellular phone industry.

71.    AT&T has also suffered harm from the significant time and effort and the associated cost it has spent remedying Defendants' fraudulent actions within the AT&T system and supply chain.

## VI.    Unauthorized Phone Unlocking is Unlawful

72.    The unlawfulness of the conduct involved in the Phone Unlocking Conspiracy is widely recognized and acknowledged.

73.    AT&T has filed multiple lawsuits in numerous federal courts across the country against bulk phone traffickers and unlocking entities, and has succeeded in obtaining Final Judgments and Permanent Injunctions. Other wireless providers such as MetroPCS, Sprint Solutions Inc., T-Mobile USA, Inc., and TracFone Wireless, Inc., have also filed multiple lawsuits in numerous federal courts across the country against bulk phone traffickers. Each of those entities has succeeded in obtaining Final Judgments and Permanent Injunctions, and in enforcing Permanent Injunctions where needed.

74.    As set forth above, AT&T unlocks Phones that are eligible for unlocking for free. Accordingly, upon information and belief, the intended purpose of Defendant's Genie SIM circumvention device is to unlock Phones that are under contract and therefore ineligible for unlocking. In any case, the operation and functionality of Defendants' Genie SIM circumvention device relies upon the use and dissemination of unauthorized AT&T ICCIDs and unauthorized access and modification to protected computers, such as the AT&T Locked iPhone devices, in

direct violation of law even if the intended purpose is to unlock AT&T devices that are eligible for unlocking.

75.     Courts have also consistently held any modern cellular phone containing an electronic processor to be a computer which is subject to protection against unauthorized access under the Computer Fraud and Abuse Act ("CFAA").  Likewise, Courts have held that unlocking of phone software, and use of proprietary codes to gain access to locked phones can form the basis for a CFAA claim.

76.     As set forth above, Defendants' activities selling Genie SIM devices and unauthorized AT&T ICCIDs facilitate the illegitimate trafficking activities outside the ambit of the Unlocking Act and in direct violation of the CFAA by unlocking new Phones and allowing persons to acquire Phones by purchasing them on installment plans without fulfilling the installment plan CSC contractual commitments.

## COUNT ONE

### TRAFFICKING IN CIRCUMVENTION TECHNOLOGY
### 17 U.S.C. §§ 1201(a)(2)

77.     AT&T reasserts the allegations set forth in Paragraphs 1 through 76 above and Exhibits 1 through 8 as though fully set forth herein.

78.     AT&T controls access to Proprietary Software installed on AT&T Locked iPhone devices by retaining control over when a user may access such software, namely, only when connected to the AT&T Authorized Network.

79.     The AT&T Locked iPhone devices contain a SIM Lock, a technological measure that in the ordinary course of the measure's operation requires the application of information, or a process or a treatment, with AT&T's authority, to gain access to the Proprietary Software, as set forth in 17 U.S.C. § 1201.

80.    The SIM Lock is a technological measure that effectively controls access to the Proprietary Software.

81.    Defendants are in possession of Genie SIM devices and unauthorized AT&T ICCID codes that, when used together, avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock that effectively controls access to the Proprietary Software on an AT&T Locked iPhone. Defendants are knowingly selling Genie SIM devices and unauthorized AT&T ICCID codes to members of the public.  Defendants also instruct members of the public on how to use the Genie SIM device and unauthorized AT&T ICCID code on new AT&T Locked iPhone devices to avoid, bypass, remove, disable, deactivate, or otherwise impair the SIM Lock.  Unlocking a new AT&T Locked iPhone device provides unauthorized access to the Proprietary Software.

82.    Defendants and their co-conspirators are knowingly trafficking in the service of circumventing the SIM Lock technological measure that protects the Proprietary Software from unauthorized access by knowingly selling Genie SIM devices and unauthorized AT&T ICCID codes to customers for a fee.

83.    Defendants' conduct does not fall within any of the exemptions under title 17 of the U.S. Code.

84.    The Genie SIM devices and unauthorized AT&T ICCID codes provided by Defendants are primarily designed or produced for the purpose of circumventing AT&T's SIM Lock technological measure that effectively controls access to Proprietary Software that is protected under title 17 of the United States Code.

85.    The Genie SIM devices and unauthorized AT&T ICCID codes provided by Defendants have, at most, only a limited commercially significant purpose or use other than

circumventing AT&T's SIM Lock technological measure that effectively control access to Proprietary Software that is protected under title 17 of the United States Code.

86.     Defendants knowingly market the Genie SIM devices and unauthorized AT&T ICCID codes for use in circumventing AT&T's SIM Lock technological measure that effectively control access to Proprietary Software that is protected under title 17 of the United States Code.

87.     Defendants have violated, and continue to violate, Section 1201 of the Copyright Act, for which AT&T has no adequate remedy at law.  As a result, AT&T has been irreparably injured by Defendants' conduct and will continue to be irreparably injured unless the violating activities of Defendants are enjoined by this Court.

## COUNT TWO

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

88.     AT&T reasserts the allegations set forth in Paragraphs 1 through 76 above and Exhibits 1 through 8 as though fully set forth herein.

89.     AT&T Locked iPhone devices are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

90.     AT&T Locked iPhone devices have a proprietary SIM Lock that only authorizes access to the AT&T Locked iPhone when it is connected to an Authorized AT&T Network.  AT&T does not authorize unlocking of AT&T Locked iPhone devices during the AT&T Service Period and, as applicable, without satisfying CSC contractual commitments.  Unlocking an AT&T Locked iPhone during the AT&T Service Period and/or when subject to CSC contractual commitments therefore provides unauthorized access to Proprietary Software on the iPhone, as well as allowing unauthorized use of the iPhone.

91.     Defendants and their co-conspirators are knowingly trafficking in unauthorized AT&T ICCIDs that effectively control access to Proprietary Software as well as the use of the AT&T Locked iPhone by offering these unauthorized AT&T ICCIDs for sale to the general public. Defendants disseminate unauthorized AT&T ICCIDs through at least the ICCID Miner service and direct communications with customers.  When an unauthorized AT&T ICCID is used in conjunction with a Genie SIM device sold concurrently by Defendants, the SIM Lock is disabled in an unauthorized manner.

92.     Defendants' transfer of unauthorized AT&T ICCIDs to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029(e)(5) in that the unauthorized AT&T ICCIDs, or otherwise disposed of, to others, or Defendants obtained control of the unauthorized AT&T ICCIDs with intent to transfer or dispose of them.

93.     Defendants' trafficking of unauthorized AT&T ICCIDs has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one year period.

94.     With respect to loss, AT&T has spent well in excess of $5,000 over a one-year period assessing the damage to AT&T Locked iPhone devices and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

95.     Also with respect to loss, AT&T has spent well in excess of $5,000 over a one year period investigating Defendants' trafficking of unauthorized AT&T ICCIDs, as well as tracking down illegitimately unlocked AT&T Locked iPhone devices.

96.     Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs in order to discover Defendants' identity and/or the method by which Defendants access protected computers without authorization.

97.     Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

98.     Defendants' conduct is intentional, malicious and willful.

99.     Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT THREE

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(A) and (C)

100.     AT&T reasserts the allegations set forth in Paragraphs 1 through 76 above and Exhibits 1 through 8 as though fully set forth herein.

101.     AT&T Locked iPhone devices are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

102.     AT&T Locked iPhone devices have a proprietary SIM Lock that only authorizes access to the Phone when it is connected to an Authorized AT&T Network.  AT&T does not authorize unlocking of AT&T Locked iPhone devices during the AT&T Service Period and, as applicable, without satisfying CSC contractual commitments.  Unlocking an AT&T Locked

iPhone during the AT&T Service Period or when subject to CSC contractual commitments therefore provides unauthorized access to proprietary software on the iPhone, as well as allowing unauthorized use of the iPhone.

103.    Defendants knowingly marketed and sold Genie SIM devices, and sold unauthorized AT&T ICCID codes to owners of AT&T Locked iPhone devices, with instructions on how to use the devices and codes to override the SIM lock on AT&T Locked iPhone devices.

104.    Through these acts, the Defendants knowingly caused the transmission of STK commands via Genie SIM devices to AT&T Locked iPhone devices without authorization. Through their sale and dissemination of unauthorized AT&T ICCID codes to customers, Defendants also knowingly caused transmission of unauthorized AT&T ICCID codes to AT&T Locked iPhone devices.  These acts disabled the SIM lock software on AT&T Locked iPhone devices without AT&T's authorization, and also accessed and caused modifications to the iPhone devices' base band and application servers, constituting unauthorized access.

105.    Defendants' illegal and unauthorized access of AT&T Phones allows them to improperly misappropriate AT&T's investment and subsidy of AT&T Locked iPhone devices.

106.    Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States, and around the world, and used in and affect interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.

107.    Defendants' unauthorized access, or otherwise facilitation of access, of Locked AT&T iPhone devices has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the

Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one-year period.

108.    With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of Genie SIM devices and unauthorized AT&T ICCID codes, as well as tracking down fraudulently sold Phones.

109.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed AT&T Locked iPhone devices without authorization.

110.    With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its AT&T Locked iPhone devices in an amount in excess of $5,000.

111.    Defendants' activities in facilitating access to AT&T Locked iPhone devices without authorization and accessing the Proprietary Software therein constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

112.    Defendants' conduct is intentional, malicious and willful.

113.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT FOUR

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. § 1030(a)(4)

114.    AT&T reasserts the allegations set forth in Paragraphs 1 through 76 above and Exhibits 1 through 8 as though fully set forth herein.

115.    AT&T Locked iPhone devices are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

116.    AT&T Locked iPhone devices have a SIM Lock that only authorizes access to the AT&T Phone when it is connected to an Authorized AT&T Network.  AT&T does not authorize unlocking of AT&T Locked iPhone devices during the AT&T Service Period and, as applicable, without satisfying CSC contractual commitments.  Unlocking an AT&T Locked iPhone during the AT&T Service Period or when subject to CSC contractual commitments therefore provides unauthorized access to Proprietary Software on the iPhone, as well as allowing unauthorized use of the iPhone.

117.    Defendants knowingly marketed and sold Genie SIM devices and unauthorized AT&T ICCID codes to owners of AT&T Locked iPhone devices, with instructions on how to use the devices and codes to override the SIM Lock on AT&T Locked iPhone devices.

118.    Through these acts, the Defendants knowingly caused the transmission of STK commands via Genie SIM devices to AT&T Locked iPhone devices without authorization. Defendants also knowingly caused transmission of unauthorized AT&T ICCID codes to AT&T Locked iPhone devices.  These acts disabled the SIM Lock software on AT&T Locked iPhone devices without AT&T's authorization, and also accessed and caused modifications to the iPhone's base band and application server, constituting unauthorized access.

119.    Defendants' illegal and unauthorized access of AT&T Phones allows them to improperly misappropriate AT&T's investment and subsidy of AT&T Locked iPhone devices.

120.    Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States, and around the world, and used in and affect interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.

121.    Defendants' unauthorized access, or otherwise facilitation of access, of Locked AT&T iPhone devices has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one-year period.

122.    With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of Genie SIM devices and unauthorized AT&T ICCID codes, as well as tracking down fraudulently sold Phones.

123.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed AT&T Locked iPhone devices without authorization.

124.    With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its AT&T Locked iPhone devices in an amount in excess of $5,000.

125.     Defendants' activities in facilitating access to AT&T Locked iPhone devices without authorization and accessing the Proprietary Software therein constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

126.     Defendants' conduct is intentional, malicious and willful.

127.     Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT FIVE

### OBTAINING INFORMATION FROM A PROTECTED COMPUTER
### 18 U.S.C. § 1030(a)(2)(C)

128.     AT&T reasserts the allegations set forth in Paragraphs 1 through 76 above and Exhibits 1 through 8 as though fully set forth herein.

129.     AT&T Locked iPhone devices are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.  AT&T Locked iPhone devices contain Proprietary Software for which AT&T controls access.  AT&T also controls access to the base band and application server on an AT&T Locked iPhone, and never authorizes users to access or modify these elements.

130.     AT&T Locked iPhone devices have a proprietary SIM Lock that only authorizes access to the AT&T Locked iPhone when it is connected to an Authorized AT&T Network.  AT&T does not authorize unlocking of AT&T Locked iPhone devices during the AT&T Service Period and, as applicable, without satisfying CSC contractual commitments.  Unlocking an AT&T Locked

iPhone during the AT&T Service Period or when subject to CSC contractual commitments therefore provides unauthorized access to proprietary software on the iPhone, as well as allowing unauthorized use of the iPhone.

131. Defendants knowingly marketed and sold Genie SIM devices and unauthorized AT&T ICCID codes to owners of AT&T Locked iPhone devices, with instructions on how to use the devices and codes to override the SIM Lock on AT&T Locked iPhone devices.

132. Through these acts, the Defendants knowingly caused the transmission of STK commands via Genie SIM devices to AT&T Locked iPhone devices without authorization. Defendants also knowingly caused transmission of unauthorized AT&T ICCID codes to AT&T Locked iPhone devices. These acts disabled the SIM Lock software on AT&T Locked iPhone devices without AT&T's authorization, and also accessed and caused modifications to the iPhone's base band and application server, constituting unauthorized access and obtaining of information from a protected computer.

133. Defendants' illegal and unauthorized access of AT&T Phones allows them to improperly misappropriate AT&T's investment and subsidy of AT&T Locked iPhone devices.

134. Defendants' activities substantially affect interstate commerce and communication in that the Phones are trafficked over the internet, throughout the United States, and around the world, and used in and affect interstate commerce and communication, and use wireless communications services pursuant to licenses issued by the Federal Communications Commission.

135. Defendants' unauthorized access, or otherwise facilitation of access, of Locked AT&T iPhone devices has caused and will continue to cause AT&T to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the

Computer Fraud and Abuse Act, respectively – substantially in excess of $5,000 over a one-year period.

136.    With respect to loss, AT&T has lost its investments in the stolen Phones with the codes/passwords and spent well in excess of $5,000 taking remedial action to counteract Defendants' unauthorized access, and conducting a damage assessment regarding Defendants' collection and dissemination of Genie SIM devices and unauthorized AT&T ICCID codes, as well as tracking down fraudulently sold Phones.

137.    Moreover, with respect to loss, AT&T has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants accessed AT&T Locked iPhone devices without authorization.

138.    With respect to damage, Defendants' actions have deprived AT&T of the means to control the quality of its product and service, and have misappropriated AT&T's financial investment in its AT&T Locked iPhone devices in an amount in excess of $5,000.

139.    Defendants' activities in facilitating access to AT&T Locked iPhone devices without authorization and accessing the Proprietary Software therein constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C).

140.    Defendants' conduct is intentional, malicious and willful.

141.    Pursuant to 18 U.S.C. § 1030(g), AT&T is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to AT&T as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

## COUNT SIX

### CONSPIRACY TO COMMIT FRAUD
### AND FRAUDULENT MISREPRESENTATION

142. AT&T reasserts the allegations set forth in Paragraphs 1 through 141 above, Exhibits 1 through 8, and Paragraphs 150 through 165 below as though fully set forth herein.

143. AT&T relies on the ICCID transmitted to AT&T Locked iPhone devices to determine whether the SIM Lock on a given AT&T iPhone will allow the phone to operate with a given wireless network. Because an AT&T ICCID can ordinarily only be loaded onto the iPhone from a genuine AT&T SIM card, transmission of an AT&T ICCID represents to AT&T and Apple that a genuine AT&T SIM card is inserted in the iPhone.

144. An agreement and conspiracy existed and continues to exist between and among the Defendants and other co-conspirators to unlawfully access computer servers to acquire unlocking codes for AT&T Locked Phones.

145. Defendants conspired with one or more co-conspirators to obtain unauthorized AT&T ICCID codes for use with the Genie SIM device. Defendants also conspired with one or more co-conspirators to disseminate unauthorized AT&T ICCID codes to purchasers of the Genie SIM device and other persons using the ICCID Miner service.

146. Defendants conspired with one or more owners of AT&T Locked iPhone devices to circumvent the AT&T SIM Lock software by using the Genie SIM device and an unauthorized AT&T ICCID to cause the device to be unlocked without authorization and resulting in harm to AT&T.

147. The specific misrepresentation occurs at the moment the user inputs the unauthorized AT&T ICCID into the phone, which misrepresents the fact that a non-AT&T SIM card is actually inserted in the iPhone. Defendants' conspiracy to commit fraud is evidenced by

36

the fact that the Genie SIM device's sole function is to bypass AT&T SIM lock protections on Locked iPhone devices, which is why the defendants marketed the device as well as the accompanying AT&T specific ICCID codes to consumers. Defendants additionally knew that the Genie SIM devices and unauthorized AT&T ICCIDs would be used in conjunction with new AT&T Locked iPhone devices that were under contractual obligations to AT&T, further evidencing Defendant's conspiracy to defraud AT&T.

148.    AT&T has been proximately damaged in excess of $75,000 by the conspiracy and Defendants' actions in furtherance thereof.

149.    Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT SEVEN

### TORTIOUS INTERFERENCE

150.    AT&T reasserts the allegations set forth in Paragraphs 1 through 149 above and Exhibits 1 through 8 as though fully set forth herein.

151.    A business relationship exists between AT&T and current and prospective AT&T customers.

152.    A contractual relationship exists between AT&T and its customers, the purchasers of its AT&T Phones and wireless service.

153.    There is a high probability of future economic benefit to AT&T as a result of these business and contractual relationships.

154.    Defendants were aware of AT&T's business and contractual relationships.

155.    Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these business and

contractual relationships between AT&T and legitimate AT&T customers or prospective customers.

156. Specifically, but without limitation, Defendants knew that AT&T has contractual and business relationships with legitimate consumers of AT&T Phones and wireless service, including the WCA, Business Agreements, CSC, AT&T PREPAID Terms, and/or Cricket Terms. Defendants interfered with these relationships by, *inter alia*, inducing purchasers of AT&T Phones to breach their contracts with AT&T, and by inducing purchasers of AT&T Phones to fraudulently enter into contracts with AT&T by activating AT&T Phones and then breaching such contracts.

157. Defendants are intentionally and unjustifiably interfering with AT&T's contracts and business relationships through improper means including fraudulent statements and misrepresentations, as set forth in detail above, and in violation of the law as set forth in other Counts.

158. Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these business relationships and contracts between AT&T and legitimate AT&T customers.

159. Defendants' acts injured AT&T's business and contractual relationships.

160. AT&T has been proximately damaged in excess of $75,000 and continues to be damaged as a result of Defendants' interference.

161. Defendants' conduct was intentional, malicious, and willful, such that an award of punitive damages is appropriate.

## COUNT EIGHT

### UNJUST ENRICHMENT

162.     AT&T reasserts the allegations set forth in Paragraphs 1 through 76 above and Exhibits 1 through 8 as though fully set forth herein.

163.     By charging a fee for unlocking new, locked AT&T Phones without authorization, Defendants have obtained benefits in excess of $75,000 from AT&T which has caused significant harm to AT&T and resulted in significant financial gain to Defendants through their profits from unlocking new, locked AT&T Phones.

164.     Defendants have knowingly and voluntarily obtained the benefits.

165.     Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying AT&T the value of the benefits Defendants acquired.

### DEMAND FOR JURY TRIAL

AT&T demands a trial by jury on all triable issues.

WHEREFORE, Plaintiffs AT&T Mobility LLC, New Cingular Wireless PCS, LLC d/b/a AT&T Mobility, AT&T Mobility Next Operations LLC,  Cricket Wireless LLC, and AT&T Corp. respectfully request that this Court enter final judgment and permanent injunctive relief in favor of the Plaintiffs and against Defendants, as follows:

(a)     awarding Plaintiffs their compensatory, consequential, statutory and special damages including, without limitation, their lost profits, Defendants' profits, loss of goodwill and damage to their reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

(b)     awarding Plaintiffs their reasonable attorneys' fees and costs associated with this action;

(c)     granting permanent injunctive relief in favor of Plaintiffs and against Defendants enjoining Defendants from engaging in the unlawful practices described in this Complaint;

(e)     granting such further relief as this Court deems just and proper.

                    Respectfully Submitted,


                    */s/ Kerin Lyn Kaminski*
                    Kerin Lyn Kaminski (0013522)
                    GIFFEN & KAMINSKI, LLC
                    1300 East Ninth Street, Suite 1600
                    Cleveland, Ohio 44114
                    Telephone:      216-621-5161
                    Facsimile:      216-621-2399
                    E-mail:         kkaminski@thinkgk.com
                    ***Counsel for Plaintiffs AT&T Mobility LLC, New Cingular Wireless PCS, LLC d/b/a AT&T Mobility, AT&T Mobility Next Operations LLC, Cricket Wireless LLC, and AT&T Corp***.